**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| ARRO-MARK CO. LLC.,<br><br>Plaintiff,<br><br>v.<br><br>CEDRIC WARREN (individually), MICHAEL MAMARY (individually), SKM INDUSTRIES, INC., SHANTA SYAL (individually), AND JOHN DOE 1-10 AND ABC CORPORATIONS 1-10 (being fictitious names of persons and entities who are not presently known to Plaintiff),<br><br>Defendants. | Case No.: 2:22-cv-6663-JKS-MAH<br><br>**OPINION**<br><br>September 5, 2024 |

**SEMPER**, District Judge.

This matter comes before the Court on Defendants SKM Industries, Inc. ("SKM") and Shanta Syal's ("Syal" and collectively with SKM, "SKM Defendants") motion to dismiss Plaintiff Arro-Mark Co. LLC's ("Plaintiff" or "Arro-Mark") Second Amended Verified Complaint (ECF 123, "SAVC") pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF 130-1, "Def. Br.") Plaintiff filed a brief in opposition. (ECF 134, "Opp.") SKM Defendants filed a reply. (ECF 134, "Reply.") The Court reviewed the Plaintiff's SAVC and the parties' submissions and decided the motion without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, SKM Defendants' motion to dismiss is **GRANTED in part** and **DENIED in part**.

## I.   FACTUAL BACKGROUND[1]

This matter arises from a dispute between two businesses. Plaintiff Arro-Mark is a closely held, family-owned business that manufactures, produces, distributes, and sells industrial inks and paints for permanent and removable marking devices in interstate commerce. (SAVC ¶ 17.) Defendant SKM manufactures, produces, and distributes industrial inks and paints for permanent and removable marking devices. (*Id.* ¶ 6.) Historically, Arro-Mark supplied SKM with inks, paints, nib applicators, and markers, which SKM resold to its customers in interstate commerce. (*Id.* ¶ 74.) Arro-Mark and SKM are competitors in the industrial inks, paints, and marking device market. (*Id.* ¶ 75.)

For roughly sixty years, Arro-Mark has developed a loyal customer base. (*Id.* ¶ 18.) It has perfected and improved product formulas and manufacturing processes for producing inks and paints for permanent and removable marking pens and devices. (*Id.*) Arro-Mark alleges that its former employees, Defendants Warren and Mamary, together with SKM and Syal—SKM's president and chief executive officer—misappropriated Arro-Mark's proprietary business information and trade secrets to give SKM Defendants an unfair commercial advantage in the industrial inks, paints, and marking pens and devices market. (*Id.* ¶¶ 7, 19.)

### A.  Warren, Arro-Mark, and SKM

Defendant Warren worked for Arro-Mark as a Laboratory Director and Chief Chemist from April 1, 2008 until November 15, 2022, when Arro-Mark terminated his employment. (*Id.* ¶ 20.) Warren's responsibilities included, but were not limited to, processing chemical formulas utilized in the marking devices manufactured and sold by Arro-Mark, researching and developing existing

---

[1] When considering a motion to dismiss under Rule 12(b)(6), the Court is obligated to accept as true allegations in the complaint and all reasonable inferences that can be drawn therefrom. *See Rocks v. City of Phila.*, 868 F.2d 644, 645 (3d Cir. 1989). Accordingly, the facts are taken from Plaintiff's Second Amended Verified Complaint.

products, and devising new product ideas. (*Id.* ¶ 21.) Throughout his employment with Arro-Mark, Warren had access to and was in charge of securing and protecting Arro-Mark's trade secrets for the formulation of inks and paints. (*Id.* ¶ 22.) He also had access to or was in charge of research and design for: inks and paints; applicator nibs for the application of Arro-Mark's inks and paints; marker barrels; containers; bottles for the storage and use of inks and paints; marketing strategies; new product ideas; customers; and ink and paint manufacturing processes. (*Id.*) Arro-Mark alleges Warren secretly and simultaneously worked for SKM Defendants and provided them with Arro-Mark's proprietary information, including formulas, nib guides, and photographs and videos of Arro-Mark's products and systems. (*Id.* ¶ 26.)

Arro-Mark alleges Warren failed to abide by various company policies and procedures. (*Id.* ¶ 27.) For example, Warren used his personal email address, his personal cell phone, and his personal laptop for business purposes (*id.* ¶ 28) and took photos and videos of Arro-Mark's specialized process for filling ink/paint bottles and Arro-Mark's "nib board," which Arro-Mark alleges was a trade secret. (*Id.* ¶ 31.) Warren was terminated by Arro-Mark for, among other reasons, taking prohibited photos and videos, misappropriating Arro-Mark's trade secrets, and conspiring with SKM Defendants to misappropriate Arro-Mark's trade secrets, intellectual property, and proprietary information. (*Id.* ¶ 44.)

After Warren's termination, Arro-Mark reviewed his office and work computer and found he was pricing out product parts, which was not part of his job responsibilities. (*Id.* ¶ 45.) On Warren's desk, Arro-Mark found formulas for at least thirty different products, including Mighty Marker Degrease "DG," Cow-Tag Marker, Bleed Thru Marker, Alcohol Bottle Marker Formulas for all colors, Xylene-based formulas for all colors, an old formula book from approximately 30 years ago, a chemical brochure, and a catalogue for a supplier. (*Id.* ¶ 46.) Arro-Mark asserts Warren

took these items without authorization and shared it with SKM Defendants. (*Id.* ¶¶ 47-50.) Arro-Mark also found SKM products and samples in Warren's desk.

### B.  Mamary, Arro-Mark, and SKM

Mamary worked at Arro-Mark as an Information Technology Specialist, Web Designer, and Graphic Artist from May 17, 2017 until December 30, 2020. (*Id.* ¶ 54.) Mamary's duties included creating and maintaining Arro-Mark's website and e-commerce store, providing in-house technical support, and creating sale sheets and marketing materials while securing the electronic integrity thereof. (*Id.* ¶ 55.) Mamary created labels for Arro-Mark's products and for its private label customers. (*Id.* ¶ 56.) During the COVID-19 Pandemic, Arro-Mark's purchasing agent fell ill, and Mamary covered the purchasing agent position for several months. (*Id.* ¶ 57.) As temporary purchasing agent, Mamary had access to all of Arro-Mark's suppliers' information, including but not limited to the suppliers' names, prices, and quality control information. (*Id.* ¶ 57.)

As Arro-Mark's on-site technology service provider, Mamary helped Arro-Mark secure its documents by creating a password sheet. (*Id.* ¶ 58.) To do so, Mamary was entrusted with all of Arro-Mark's passwords, which gave Mamary access to all of Arro-Mark's proprietary information, including proprietary formulas. (*Id.*) Further, as needed, Mamary assisted Arro-Mark with purchasing, creating "nib boards," and creating nib guides with Arro-Mark's proprietary information. (*Id.* ¶ 59.) Through his positions as Information Technology Specialist and Graphic Design Artist, Mamary had access to: Arro-Mark's trade secrets for the formulation of inks and paints; research and design of nibs for the application of Arro-Mark's inks and paints; research and design for marker bodies and bottles for the storage and application of inks and paints; paint manufacturing processes; product pricing information; and information concerning suppliers of

raw materials, parts, and nibs. (*Id.* ¶ 60.) Mamary was also in charge of keeping this information secure. (*Id.*)

Along with the other duties listed above, Mamary was assigned to develop and publish Arro-Mark's website, which took him approximately 18 to 24 months to complete. (*Id.* ¶ 61.) Mamary utilized Arro-Mark's artwork, labels, SDS sheets, nib guides, pricing, and other proprietary information to create the website. (*Id.*) Arro-Mark's website featured several "distinctive" elements. (*See id.* ¶ 62.)

On December 30, 2020, Mamary resigned from his positions at Arro-Mark. (*Id.* ¶ 63.) With Warren's encouragement, Mamary applied for a position with SKM. (*Id.* ¶ 64.) Arro-Mark alleges Mammary applied for the job to misappropriate Arro-Mark's trade secrets, intellectual property, and proprietary information. (*Id.*) Warren did not tell Arro-Mark that he encouraged Mamary to work for SKM Defendants. (*Id.* ¶ 65.) Syal did not inform Arro-Mark that she was considering or was in fact hiring Mamary. (*Id.*) Mamary did not inform Arro-Mark that he was going to work for SKM Defendnats. (*Id.*) SKM Defendants held Mamary out as an employee of SKM. (*Id.* ¶ 66.)

**C.  The Website and Anonymous E-mail**

Plaintiff asserts Mamary provided and installed the identical website that he had created for Plaintiff for SKM in or around September 2022. (*Id.* ¶¶ 67-68.) After being contacted by Arro-Mark, SKM took down the website. (*Id.* ¶ 109.)

On or about September 22, 2022, at or around 5:38 p.m., Arro-Mark received an anonymous email stating that Mamary "is selling your company's secrets and artwork." (*Id.* ¶ 69.) Thereafter, Arro-Mark contacted Mamary and Syal. (*Id.* ¶ 70.) That same day, between approximately 5:38 p.m. and 6:28 p.m., Mamary told Syal about the anonymous email, and Syal called Warren to discuss the email. (*Id.* ¶ 71.) At or around 6:28 p.m., Syal informed Mamary that

she spoke with Warren, who told her that Mamary did nothing wrong. (*Id.* ¶ 72.) Syal also allegedly told Mamary that "there is nothing wrong to do similar web. Because all our products are similar." (*Id.*) Arro-Mark alleges, upon information and belief, that Syal. worked with Warren and Mamary to misappropriate Arro-Mark's information (*id.* ¶ 81) and secretly hired Warren while he still worked for Arro-Mark (*id.* ¶ 82). Upon information and belief, Arro-Mark also alleges that Syal asked Warren to provide SKM with: Arro-Mark's formulas, nib guides, and photographs; videos of Arro-Mark products, factories, and systems; samples of Arro-Mark's products; Arro-Mark's suppliers' names and information; Arro-Mark's pricing list; and Arro-Mark's customer lists. (*Id.* ¶ 83.) Arro-Mark further asserts that Syal asked Warren to steer customers away from Arro-Mark to SKM (*id.* ¶ 83); asked Mamary to copy Arro-Mark's website to create an identical website for SKM (*id.* ¶ 84); asked Mamary to use the information that he had learned while working for Arro-Mark concerning the nib guides, Arro-Mark's pricing structures, artwork, and so forth to create the SKM website (*id.* ¶ 85); and told Mamary not to contact or tell Arro-Mark about his employment with SKM or his use of Arro-Mark's trade secrets and proprietary information in creating the SKM website (*id.* ¶ 86).

### D.  The Nib Board and Arro-Mark's Nib Suppliers

Nibs are the parts of pens and markers that come into contact with a surface and deposit ink. Arro-Mark utilizes a variety of nib suppliers.[2] At a September 29, 2022 meeting between Arro-Mark and SKM Defendants, Syal admitted that an Arro-Mark nib supplier ("Supplier 2") visited SKM's factory. (*Id.* ¶ 89.) Arro-Mark later learned that Mamary and/or Warren provided SKM Defendants with a photograph of a board in Arro-Mark's office that detailed every nib purchased from Supplier 2 and Supplier 3. (*Id.* ¶ 90.) The board, which Arro-Mark alleges is

---

[2] Arro-Mark does not disclose the identity of specific suppliers, but instead refers to them as Supplier 1, Supplier 2, Supplier 3, and Supplier 4.

proprietary, describes which nibs are utilized by Arro-Mark in all its markers and which nibs are used for each specific marker. (*Id.*)

On or around October 13, 2022, Arro-Mark received a credit inquiry from Supplier 4, seeking verification of SKM's credit. (*Id.* ¶ 91.) Supplier 4 supplies Arro-Mark with a product for a water-based marker that SKM neither private-labeled through Arro-Mark nor made itself. (*Id.* ¶ 92.) The formulas found on Warren's desk match the products supplied by Supplier 4 to Arro-Mark. (*Id.* ¶ 93.)

**E.  Arro-Mark's Trademarks**

**a.  "Valve Controlled"**

Arro-Mark is the owner of United States Trademark Reg. No. 3,577,311 for the design mark "Valve Controlled" used in connection with felt tip marking pens in International Class 16. (*Id.* ¶ 124.) The design mark was registered on the Principal Register on February 17, 2009. (*Id.* ¶ 125.) On February 17, 2014, Arro-Mark filed a Combined Declaration of Use and Incontestability under Sections 8 and 15, making the trademark incontestable. (*Id.* ¶ 126.) On January 8, 2019, Arro-Mark filed a Combined Declaration of Use and/or Excusable Nonuse/Application for Renewal of Registration of a Mark under Sections 8 and 9. (*Id.* ¶ 127.) The description of the mark is: "The mark consists of three marker pen tips. There are two downward arrows surrounding the middle marker pen tip and two upward arrows surrounding the right marker pen tip. The words 'valve controlled' are above the three marker pen tips. The entire mark is contained within a rectangular box." (*Id.* ¶ 128.) Color is not claimed as a feature of the mark. (*Id.*)

Arro-Mark alleges that the SKM Defendants, without Arro-Mark's authorization, used the identical "Valve Controlled" mark on its website and in promotional materials, which have been

distributed at trade shows such as Fabtech held in Atlanta, Georgia on November 8-10, 2022, which had over 30,000 attendees. (*Id.* ¶ 129.)

### b.  "Mighty Marker"

Arro-Mark is also the owner of United States Trademark Reg. No. 3,032,336 for the mark "Mighty Marker," registered in International Class 16. (*Id.* ¶ 130.) The mark was registered on the Principal Register on December 20, 2005. (*Id.* ¶ 131.) On December 19, 2011, Arro-Mark filed a Combined Declaration of Use and Incontestability under Sections 8 and 15, making its trademark incontestable. (*Id.* ¶ 132.) On November 24, 2015, Arro-Mark filed a Combined Declaration of Use and/or Excusable non-use/ Application for Renewal of Registration of a Mark under Sections 8 and 9. (*Id.* ¶ 133.) This word mark is used on all Arro-Mark markers. (*Id.* ¶ 134.)

SKM sells a marker called High Purity Pump Action with the word mark "Mighty Marker" on the label. (*Id.* ¶ 135.) SKM also sells the "Low Chloride" marker, with Arro-Mark's word mark "Mighty Marker." (*Id.* ¶ 136.)

On or around June 6, 2023, Arro-Mark was contacted by a potential customer, referred to as "Potential Customer 1," who purchased what was believed to be Arro-Mark's Mighty-Marker. (*Id.* ¶ 94.) However, this marker was not delivered with the appropriate laboratory certifications from the authorized distributor, referred to as "Distributor 1," through whom the product was purchased. (*Id.* ¶ 94.) After communicating with Potential Customer 1, Arro-Mark realized that the marker, which was labeled "Mighty Marker," was not an Arro-Mark marker, but instead, an SKM marker utilizing Arro-Mark's trademark. (*Id.* ¶ 95.) When Arro-Mark asked how Potential Customer 1 was directed to Arro-Mark to obtain the lab analysis for the purchased markers, Potential Customer 1 stated "Arromark kept showing up during online searches." (*Id.* ¶ 96.) After this issue came to light, and Arro-Mark confirmed with Distributor 1 that the product was in fact

not an Arro-Mark Mighty Marker, Arro-Mark concluded that even distributors were confusing Arro-Mark's Mighty Marker with SKM Defendants' Mighty Marker. (*Id.* ¶ 97.)

Plaintiff asserts that Potential Customer 1 is a customer that would have purchased the proper marker from Arro-Mark. (*Id.* ¶ 98.) Arro-Mark further asserts that Arro-Mark, Distributor 1, and Potential Customer 1 were all harmed due to the confusion in the marketplace from SKM Defendants' improper use of Arro-Mark's marks and trademarks. (*Id.* ¶ 98.) Arro-Mark further asserts that upon information and belief, Potential Customer 1 received an expired batch of SKM's Mighty Marker, which puts Potential Customer 1, the industry, and the public at harm. (*Id.* ¶ 99.)[3]

### c. "Bleed-Thru"

Arro-Mark is also the owner of United States Trademark Reg. No. 3,342,246 for the mark "Bleed-Thru," registered in International Class 16. (*Id.* ¶ 138.) The mark was registered on the Principal Register on November 20, 2007. (*Id.* ¶ 139.) Arro-Mark sells a marker titled "Mighty Marker Bleed Thru Ink Markers." (*Id.* ¶ 140.) SKM also sells a marker titled "Bleed Thru Ink Marker." (*Id.* ¶ 141.)

### F. The Present Motion

On October 10, 2023, Arro-Mark filed its SAVC. (*See* ECF 126.) Arro-Mark's SAVC asserts 20 counts:

- Three trade secret misappropriation claims: Count 1: misappropriation of trade secrets under the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836; Count 2: misappropriation of trade secrets under the New Jersey Trade Secrets Act ("NJTSA"), N.J. Stat. Ann. § 56:15-1 *et seq.*; and Count 8: common law misappropriation;

---

[3] Expired markers can corrode marked metals prematurely and could lead to violations of compliance obligations. (SAVC ¶ 99.)

- Three civil conspiracy claims: Count 3: civil conspiracy pursuant to Section 1 of the Sherman Act, 15 U.S.C. § 1; Count 4: civil conspiracy pursuant to the New Jersey Anti-Trust Act, N.J. Stat. Ann. § 56:9-3; and Count 5: common law civil conspiracy;

- One claim of attempted monopolization: Count 14:  attempted monopolization pursuant to Section 2 of the Sherman Act, 15 U.S.C. § 2;

- One claim of tortious interference with prospective economic advantage, Count 6;

- One claim of unjust enrichment, Count 7, asserted only against Cedric Warren and Michael Mamary;

- One claim for breach of loyalty, Count 9, asserted only against Cedric Warren;

- Two counts of trademark infringement: Count 10: federal trademark infringement under 15 U.S.C. § 1114 of the Lanham Act and Count 11: common law trademark infringement;

- One false association claim, Count 12, asserted pursuant to 15 U.S.C § 1125(a)(l)(A) of the Lanham Act;

- Two unfair competition claims: Count 17: unfair competition under 15 U.S.C. § 1125(a) of the Lanham Act and Count 13: common law unfair competition;

- Two trademark dilution claims: Count 15: federal trademark dilution under 15 U.S.C. § 1125(c)(l) of the Lanham Act and Count 16: trademark dilution under N.J. Stat. Ann. § 56:3-13.20;

- One trade dress infringement claim: Count 18: trade dress infringement under 15 U.S.C. § 1125 of the Lanham Act; and

- Two counts of trademark counterfeiting: Count 19: trademark counterfeiting pursuant to the Lanham Act and Count 20: trademark counterfeiting under N.J. Stat. Ann. § 56:3-13.16.

On November 8, 2023, SKM Defendants moved to dismiss the claims asserted against them in the SAVC. Accordingly, the Court only addresses the claims asserted against both SKM Defendants and SKM individually.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) governs motions to dismiss for "failure to state a claim upon which relief can be granted[.]" For a complaint to survive dismissal under the Rule, it must contain sufficient factual matter to state a claim that is plausible on its face. *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Although the plausibility standard "does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal quotation marks and citations omitted). As a result, a plaintiff must "allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of [his] claims." *Id.* at 789.

In evaluating the sufficiency of a complaint, district courts must separate the factual and legal elements. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009). Restatements of a claim's elements are legal conclusions, and therefore, not entitled to a presumption of truth. *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011). The Court, however, "must accept all of the complaint's well-pleaded facts as true." *Fowler*, 578 F.3d at 210. Even if plausibly pled, however, a complaint will not withstand a motion to dismiss if the facts alleged do not state "a legally cognizable cause of action." *Turner v. J.P. Morgan Chase & Co.*, No. 14-7148, 2015 WL 12826480, at *2 (D.N.J. Jan. 23, 2015).

## III.   ANALYSIS

### A.   Trade Secret Misappropriation Claims (Counts 1, 2, and 8)

Arro-Mark asserts three trade secret misappropriation claims: Count 1: misappropriation of trade secrets under the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836; Count 2: misappropriation of trade secrets under the New Jersey Trade Secrets Act ("NJTSA"), N.J. Stat. Ann. § 56:15-1 *et seq.*; and Count 8: common law misappropriation. Defendants argue these claims

must be dismissed because Plaintiff does not identify trade secrets, how such trade secrets were misappropriated, or how Plaintiff was damaged. (Def. Br. at 7-10.)

### i. DTSA and NJTSA Claims

Because "courts in this district 'fold' the DTSA analysis into the NJTSA review," the Court considers the two claims together. *Corp. Synergies Grp., LLC v. Andrews*, No. 18-13381, 2019 WL 3780098, at *3 (D.N.J. Aug. 12, 2019) (quoting *Scherer Design*, No. 18-3540, 2018 WL 3613421, at *4 (D.N.J. July 26, 2018)). Notably, there is no heightened pleading standard for a misappropriation of trade secrets claim. *See IDT Corp. v. Unlimited Recharge, Inc.*, No. 11-4992, 2012 WL 4050298, at *7 (D.N.J. Sept. 13, 2012); *Oakwood Labs v. Thanoo*, 999 F.3d 892, 913 (3d Cir. 2021). To state a claim under DTSA and the NJTSA, a plaintiff must allege: (1) the existence of a trade secret, defined generally as information with independent economic value that the owner has taken reasonable measures to keep secret; (2) that it is related to a product or service used in, or intended for use in, interstate or foreign commerce; and (3) the misappropriation of that trade secret, defined broadly as the knowing improper acquisition, or use or disclosure of the secret. *Oakwood Labs*, 999 F.3d at 905. Circumstantial claims may be credited at the motion to dismiss stage given the lack of discovery to inform the complaint, so long as these claims raise a right to relief above the speculative level. *Id.* at 913.

In a complaint, a plaintiff must allege two elements to demarcate a trade secret. First, the complainant "must sufficiently identify the information it claims as a trade secret," and, second, the complainant "must allege facts supporting the assertion that the information is indeed protectable as such." *Id.* at 905. In identifying a trade secret, (i) "[t]he [allegedly] misappropriated trade secret must be identified with enough specificity to place a defendant on notice of the bases for the claim being made against it[;]" and (ii) "the subject matter of the trade secret must be

described with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the secret lies." *Id.* at 906-13. A complaint does not, however, need to "spell out the details" of the trade secret to avoid dismissal. *Id.* at 906 (citation omitted). Indeed, sufficient identification of the information does not require scientific specificity at the complaint stage, rather, lists of categories of data can be sufficient. *OWAL Inc. v. Caregility Corp.*, No. 21-13407, 2022 WL 890182, at *7 (D.N.J. Mar. 25, 2022). Further, whether a complainant has adequately demarcated a trade secret is a fact-specific inquiry for each case. *Id.* (quoting *Vesta Corp. v. Amdocs Mgmt. Ltd.*, 147 F. Supp. 3d 1147, 1155 (D. Or. 2015)). The standard, however, is one of notice, not of detail, and this District has been clear that a plaintiff is not required to "articulate each individual trade secret by name and description" at the pleading stage. *Rodgers Grp., LLC v. Lewis*, No. 22-482, 2022 WL 4095785, at *4 (D.N.J. Sept. 7, 2022).

Here, Plaintiff Arro-Mark identifies the following as its trade secrets: (a) formulations of inks; (b) formulations of paints; (c) research and design of nibs for the application of Plaintiff's inks and paints; (d) research and design for marker bodies and bottles for the storage and application of inks and paints; and (e) research and design for ink and paint manufacturing processes. (SAVC ¶¶ 145, 162.) Arro-Mark asserts such information was only available to a select number of individuals at Arro-Mark, including Warren and Mammary. (*See, e.g. id.* ¶¶ 146-58.) While SKM Defendants argue that Arro-Mark fails to sufficiently identify the trade secrets at issue, the listing of relatively broad categories of information can be acceptable at the pleading stage, particularly if these lists are linked to the circumstances by which the information is stolen. For example, in *OWAL Inc. v. Caregility Corp.*, the court held that lists of "confidential information" including "notes, analyses, compilations, studies, or other documents," and "evaluation materials"

including, among other categories, "financial information, business plans and strategies [and] marketing plans" were sufficient to plead specific trade secrets, as this information was linked to "materials [plaintiff] provided to [defendant]." *OWAL Inc.*, 2022 WL 890182, at *7. Here, the trade secrets described by Arro-Mark and their link to a claim of potential misappropriation are sufficiently specific. *See also Ho-Ho-Kus, Inc. v. Sucharski*, No. 23-01677, 2023 WL 7403539, at *6-9 (D.N.J. Nov. 9, 2023).

SKM Defendants also assert that Arro-Mark failed to sufficiently plead misappropriation. At the pleading state, circumstantial evidence is sufficient to allege misappropriation of a trade secret. *Oakwood Labs*, 999 F.3d at 913. Trade secret owners must be given a fair opportunity to prove misappropriation, and the Court must be mindful that the owner does not have the benefit of discovery to provide direct evidence at this stage. *Id.* at 910. The Third Circuit has explained:

> Misappropriation and misuse can rarely be proved by convincing direct evidence. In most cases plaintiffs must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him that it is more probable than not that what plaintiffs allege happened did in fact take place.

*SI Handling Sys. v. Heisley*, 753 F.2d 1244, 1261 (3d Cir. 1985) (quoting *Greenberg v. Croydon Plastics Co.*, 378 F. Supp. 806, 814 (E.D. Pa. 1974)). Here, Arro-Mark merely needs to persuade the Court that its version of events is plausible. *Ho-Ho-Kus, Inc. v. Sucharski*, No. 23-01677, 2023 WL 7403539, at *8 (citing *Ashcroft*, 556 U.S. at 672 (quoting *Twombly*, 550 U.S. at 570)). Among other allegations, Arro-Mark asserts that, because of his roles within the company, Warren had access to and was in charge of securing and protecting various Arro-Mark trade secrets and that he secretly and simultaneously worked for SKM Defendants and provided them with Arro-Mark's trade secrets. (SAVC ¶¶ 21-22, 26.) Arro-Mark also asserts that, because of his roles within the company, Mamary had access to Arro-Mark trade secrets, and he went to work for SKM in order

14

to facilitate their misappropriation. (*Id.* ¶¶ 54-60, 64-66.) The SAVC also details communications between Syal, Warren, and Mamary that Arro-Mark alleges evidence the misappropriation. (*See, e.g., id.* ¶¶ 69-72.) At the pleading stage, these allegations are sufficient.

Furthermore, SKM Defendants argue that Arro-Mark has failed to sufficiently identify how it sustained damage because of the alleged misappropriation. "The Third Circuit has held that trade secret misappropriation always causes harm because the value of the secret is destroyed when it is revealed to unauthorized parties." *Ho-Ho-Kus, Inc.*, 2023 WL 7403539, at *9 (citing *Oakwood Labs*, 999 F.3d at 913). In this sense, a trade secret creates value for its owner by its secrecy. *Ho-Ho-Kus, Inc.*, 2023 WL 7403539, at *9. When that secrecy is lost, the owner "has lost the exclusive use of trade secret information, which is a real and redressable harm." *Id.* at *9 (quoting *Oakwood Labs*, 999 F.3d at 914). Furthermore, a plaintiff may sustain competitive harms from a competitor using its secrets. *Ho-Ho-Kus, Inc.*, 2023 WL 7403539, at *9. Arro-Mark alleges that it lost profits and potential customers because of the Defendants' conduct.

Accordingly, SKM Defendants' motion to dismiss Counts 1 and 2 is denied.[4]

### ii. Common Law Misappropriation

New Jersey common law misappropriation claims have similar requirements as DTSA and NJTSA claims, but add an additional element: whether plaintiff took precautions to maintain trade secret secrecy. *OWAL, Inc.*, 2022 WL 890182, at *6 (citing *Rycoline Prods., Inc. v. Walsh*, 756

---

[4] While SKM Defendants argue that Plaintiff's misappropriation claims are preempted by the Copyright Act, "misappropriation causes of action are not preempted if they are based on claims not equivalent to the exclusive rights within the general scope of the Copyright Act." *Dun & Bradstreet Software Servs. v. Grace Consulting, Inc.*, 307 F.3d 197, 217 (3d Cir. 2002). "[T]he federal Copyright Act does not preempt a claim where '[a]n extra element is required instead of or in addition to the acts of reproduction, performance, distribution or display, in order to constitute a state-created cause of action . . . A state law claim is not preempted if the extra element changes the nature of the action so that it is qualitatively different from a copyright infringement claim.'" *Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*, 210 F.Supp.2d 552, 564 (D.N.J. 2002) (quoting *Expediters Int'l of Washington, Inc. v. Direct Line Cargo Mgmt. Svcs., Inc.*, 995 F. Supp. 468, 479-80 (D.N.J. 1998)). Here, Plaintiff's misappropriation claims are not preempted as they require additional elements not found in the Copyright Act.

A.2d 1047, 1052 (N.J. Super. Ct. App. Div. 2000)). Arro-Mark alleges that to protect its trade secrets, only select employees had access to trade secrets (SAVC ¶ 60), information was password protected (*id.* ¶ 58), some proprietary information was kept in a restricted area to which Warren had access (*id.* ¶ 47), and Arro-Mark had policies restricting use of personal phones, emails, and computers in the workplace (*id.* ¶ 28). At the pleading stage, these allegations are sufficient. SKM Defendants' motion to dismiss Count 8 is denied.

### B.  Civil Conspiracy Claims (Counts 3, 4, and 5)

Plaintiff asserts three civil conspiracy claims: civil conspiracy pursuant to Section 1 of the Sherman Act, 15 U.S.C. § 1 (Count 3); civil conspiracy pursuant to the New Jersey Anti-Trust Act ("NJAA"), N.J. Stat. Ann. § 56:9-3 (Count 4); and civil conspiracy under New Jersey law (Count 5). SKM Defendants argue that all three claims must be dismissed because Arro-Mark's allegations describe parallel business behavior, and the SAVC fails to sufficiently allege anti-competitive effects. (Def. Br. at 15-19.)

#### i. Civil Conspiracy Pursuant to the Sherman Act and NJAA (Counts 3 and 4)

Because New Jersey courts "follow federal antitrust law in interpreting [the NJAA]," *Wilson v. General Motors Corp.*, 921 A.2d 414, 416 (N.J. 2007) (citing N.J. Stat. Ann. § 56:9-18), the Court relies on case law applying the federal antitrust statutes to analyze Plaintiff's claims. *See United Ass'n of Plumbers & Pipefitters Loc. 322 of S. N.J. v. Mallinckrodt ARD, LLC*, No. 20-188, 2020 WL 5627149, at *11 (D.N.J. Aug. 18, 2020). To assert a Sherman Act Section 1 claim (and N.J. Stat. Ann. § 56:9-3 claim), a plaintiff must allege: "(1) concerted action by the defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted actions were illegal; and (4) that it was injured as a proximate result of the

concerted action." *Id.* (quoting *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 253 (3d Cir. 2010)).

SKM Defendants argue that Arro-Mark's civil conspiracy claims must fail because its allegations amount to lawful parallel business behavior and do not sufficiently evidence an agreement. (Def. Br. at 17-18.) In *Bell Atlantic Corporation v. Twombly*, the United States Supreme Court held that to state a Sherman Act Section 1 claim:

> a complaint [must contain] enough factual matter (taken as true) to suggest that an agreement was made. . . . lawful parallel conduct fails to bespeak unlawful agreement. . . . [A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality. Hence, when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556-557 (2007.) Here, the SAVC does not sufficiently allege that Mamary, Warren, Syal, and SKM entered into an agreement. While Arro-Mark alleges that Warren and Mamary accessed trade secrets and proprietary information (*see, e.g.*, SAVC ¶¶ 49, 60) and that, upon information and belief, Syal and SKM used such trade secrets and proprietary information (*id.* ¶¶ 82-86), the SAVC does not assert that these parties entered into an unlawful agreement giving rise to a conspiracy. "A statement of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary to make out a § 1 claim; without that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory." *Twombly*, 550 U.S. at 557. Accordingly, Counts 3 and 4 are dismissed without prejudice.

### ii. Civil Conspiracy Under New Jersey Law (Count 5)

"In New Jersey, a civil conspiracy is 'a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage.'" *Banco Popular N. Am. v. Gandi*, 876 A.2d 253, 263 (N.J. 2005) *Morgan v. Union Cty. Bd. of Chosen Freeholders*, 633 A.2d 985, 998 (N.J. Super. Ct. App. Div. 1993). "[C]ivil conspiracy claims require both an agreement and '[s]ome act that is itself a tort . . . committed by one of the parties in pursuance of the agreement.'" *United Ass'n of Plumbers & Pipefitters Loc. 322 of S. N.J.*, 2020 WL 5627149, at \*20 (quoting *Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*, 331 F.3d 406, 414 (3d Cir. 2003) (noting that "[m]ere agreement to do a wrongful act can never alone amount to a tort")). " As explained above, Arro-Mark has not sufficiently alleged the existence of an agreement between the parties. Accordingly, Count 5 is dismissed without prejudice.

### C. Attempted Monopolization Claim (Count 14)

In Count 14, Plaintiff asserts a claim for attempted monopolization pursuant to Section 2 of the Sherman Act. SKM Defendants argue this claim must be dismissed because the SAVC does not allege a specific intent to monopolize, SKM Defendants did not engage in anticompetitive conduct, and the SAVC fails to show a dangerous probability that SKM will achieve monopoly power. (Def. Br. at 19-21.)

"To prevail on a claim under Sherman Act Section 2 for attempted monopolization, a plaintiff must prove: '(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.'" *Phila. Taxi Assoc. v. Uber Techs.*, 886 F.3d 332, 339 (3d Cir. 2018) (quoting *Mylan*

*Pharms. Inc. v. Warner Chilcott Pub. Ltd. Co.*, 838 F.3d 421, 433 (3d Cir. 2016) (quoting *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 317 (3d Cir. 2007))).[5] "Liability hinges on whether valid business reasons, as part of the ordinary competitive process, can explain the defendant's actions that resulted in a dangerous probability of achieving monopoly power." *Phila. Taxi Assoc.*, 886 F.3d at 339. Here, the SAVC is devoid of allegations that SKM Defendants had a specific intent to monopolize. "[I]n a traditional § 2 claim, a plaintiff would have to point to specific, egregious conduct that evinced a predatory motivation and a specific intent to monopolize." *Id.* at 341 (quoting *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 406 (3d Cir. 2016) (citing *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993))). Accordingly, Plaintiff fails to state a claim pursuant to 15 U.S.C. § 2. Count 14 is dismissed without prejudice.[6]

### D. Tortious Interference Claim (Count 6)

In Count 6, Arro-Mark asserts a claim of tortious interference with economic advantage against all Defendants. Defendants argue this claim must be dismissed because Arro-Mark failed to plead facts satisfying the claim's elements. (Def. Br. at 36-37.)

"The elements of tortious interference with economic advantage are (1) a 'reasonable expectation of economic advantage'; (2) interference done intentionally and with malice; (3) injury, in the sense of the loss of prospective gain; and (4) damages." *Austar Int'l, Ltd. v. Austarpharma LLC*, 425 F. Supp. 3d 336, 358 (D.N.J. 2019) (citing *MacDougall v. Weichert*, 677 A.2d 162, 174 (N.J. 1996)). The protectable right need not be a contract, but "there must be

---

[5] To recover damages on a Section 2 claim, a plaintiff must also prove it suffered an "antitrust injury." *Miller Indstries Towing Equip. Inc. v. NRC Indus.*, 659 F. Supp. 3d 451, 463 (D.N.J. 2023) (citation omitted). Antitrust injuries have three elements: (1) an injury-in-fact; (2) that has been caused by the Act's violation; and (3) that is the type of injury contemplated by the Act. *Id.*

[6] Because the Court is dismissing this claim for failure to plead specific intent, it will not address the other arguments raised by SKM Defendants. The Court also notes that because the dangerous probability standard is a complex and fact-intensive inquiry, courts typically should not resolve this question at the pleading stage unless it is clear on the face of the complaint that the dangerous probability standard cannot be met as a matter of law. *Phila. Taxi Assoc. v. Uber Techs.*, 886 F.3d 332, 341-42 (3d Cir. 2018).

allegations of fact giving rise to some reasonable expectation of economic advantage." *Austar Int'l, Ltd.*, 425 F. Supp. 3d at 358 (quoting *Printing Mart-Morristown v. Sharp Elecs. Corp.*, 563 A.2d 31, 37 (N.J. 1989) (citation and internal quotation marks omitted)).

Arro-Mark tethers its tortious interference claim to communications it had with an unnamed party it refers to as "Potential Customer 1." On or around June 6, 2023, Arro-Mark was contacted by Potential Customer 1, who purchased what was believed to be Arro-Mark's Mighty-Marker. (SAVC ¶ 94.) However, this marker was not delivered with the appropriate laboratory certifications from the authorized distributor, referred to as "Distributor 1," through whom the product was purchased. (*Id.* ¶ 94.) After communicating with Potential Customer 1, Arro-Mark realized that the marker, which was labeled "Mighty Marker," was not an Arro-Mark marker, but instead, an SKM marker utilizing Arro-Mark's trademark. (*Id.* ¶ 95.) When Arro-Mark asked how Potential Customer 1 was directed to Arro-Mark to obtain the lab analysis for the purchased markers, Potential Customer 1 stated "Arromark kept showing up during online searches." (*Id.* ¶ 96.) At the very least, these allegations fail to demonstrate SKM Defendants' malice.[7] State and federal courts in New Jersey have defined the term malice as "harm . . . inflicted intentionally and without justification or excuse." *MacDougall*, 677 A.2d at 174 (quoting *Printing Mart-Morristown*, 563 A.2d at 37); *Austar Int'l Ltd.*, 425 F. Supp. 3d at 359 ("Although the common meaning of malice connotes ill-will toward another person, . . . malice in the legal sense is the intentional doing of a wrongful act without justification or excuse" (internal citations and

---

[7] As to the element of lost business or gain, "[a] plaintiff need not identify multiple lost business opportunities to establish a cause of action for tortious interference, but it must identify one." *Austar Int'l, Ltd. v. Austarpharma LLC*, 425 F. Supp. 3d 336, 358 (D.N.J. 2019) (quoting *Am. Millennium Ins. Co. v. First Keystone Risk Retention Grp.*, Inc., 332 F. App'x 787, 790 (3d Cir. 2009) (indicating that to state a claim for tortious interference under New Jersey law a plaintiff must identify at least a "single, specific customer" that it lost or could have acquired)). "[A] plaintiff must do more than assert that it lost business. Rather it 'must allege facts that show an existing or prospective economic or contractual relationship' for a 'mere allegation of lost business does not suffice.'" *Austar Int'l, Ltd.*, 425 F. Supp. 3d 336 at 358 (citing *Advanced Oral Techs., LLC v. Nutrex Research, Inc.*, No. 10-5303, 2011 WL 1080204, at *4 (D.N.J. Mar. 21, 2011) (quoting *Eli Lilly & Co. v. Roussel Corp.*, 23 F. Supp. 2d 460, 494 (D.N.J. 1998))).

quotations omitted)). Because Plaintiff fails to allege SKM Defendants' malice, Count 6 is dismissed without prejudice.

### E. Trademark Infringement, False Association, and Unfair Competition Claims (Counts 10, 11, 12, 13, and 17)

Arro-Mark asserts two claims of trademark infringement against Defendant SKM: federal trademark infringement under 15 U.S.C. § 1114 of the Lanham Act (Count 10) and common law trademark infringement (Count 11). Arro-Mark also asserts a claim of false association against SKM pursuant to the Lanham Act, 15 U.S.C § 1125(a)(l)(A) (Count 12). Furthermore, Arro-Mark asserts two unfair competition claims against SKM: unfair competition under 15 U.S.C. § 1125(a) of the Lanham Act (Count 17) and common law unfair competition (Count 13). SKM argues all claims must be dismissed.

To establish a claim for federal trademark infringement, a plaintiff must show that (1) it has a valid and legally protectable mark; (2) it owns the mark; and (3) defendant's use of the mark causes a likelihood of confusion. *E.A. Sween Co. v. Deli Exp. of Tenafly, LLC*, 19 F. Supp. 3d 560, 568 (D.N.J. 2014) (quoting *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000)). "In New Jersey, liability for common law trademark infringement is established when a defendant violates the federal Lanham Act for trademark infringement." *Bambi Baby.com Corp. v. Madonna Ventures, Inc.*, No. 18-12669, 2019 WL 2337447, at *9 (D.N.J. June 3, 2019); *Coach, Inc. v. Cosmetic House,* No. 10-2794, 2011 WL 1211390, at *5 (D.N.J. March 29, 2011) ("liability for trademark infringement under federal law is sufficient to establish common law trademark infringement"); *La Cena Fine Foods, Ltd. v. Jennifer Fine Foods*, No. 01-5746, 2006 WL 2014503, at *8 (D.N.J. July 18, 2006) (finding common law trademark infringement based on Lanham Act violation); *see also Barre-Nat'l, Inc. v. Barr Labs., Inc.*, 773

F. Supp. 735, 746 (D.N.J. 1991) ("the test for common law trademark infringement is the same as for federal trademark infringement").

Moreover, the elements of a false association claim mirror the elements of a trademark infringement claim. *Parks LLC v. Tyson Foods, Inc.*, 863 F.3d 220, 230 (3d Cir. 2017) (explaining that to establish false association, a plaintiff must prove: (1) the trademark is valid and legally protectable; (2) plaintiff owns the trademark; and (3) defendant's use of the trademark to identify goods or services is likely to create confusion concerning the origin of the goods or services).

Furthermore, federal trademark infringement and federal unfair competition claims are measured by identical standards. *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000). Likewise, "the elements of a claim of unfair competition under the Lanham Act are the same as for claims of unfair competition and trademark infringement under New Jersey statutory and common law." *Buying For The Home, LLC v. Humble Abode, LLC*, 459 F. Supp. 2d 310, 317-18 (D.N.J. 2006) (citing *J & J Snack Foods, Corp. v. Earthgrains Co.*, 220 F. Supp. 2d 358, 374 (D.N.J. 2002) ("[T]he elements for a claim for trademark infringement under the Lanham Act are the same as the elements for a claim of unfair competition under the Lanham Act and for claims of trademark infringement and unfair competition under New Jersey statutory and common law"); *Konowicz v. Carr*, 838 F. App'x 1, 7 (3d Cir. 2020). Accordingly, the Court's forthcoming analysis applies to Arro-Mark's trademark infringement, false association, and unfair competition claims.

### a.  "Valve Controlled"

Arro-Mark is the owner of United States Trademark Reg. No. 3,577,311 for the design mark "Valve Controlled" used in connection with felt tip marking pens in International Class 16. (SAVC ¶ 124.) The design mark was registered on the Principal Register on February 17, 2009.

(*Id.* ¶ 125.) On February 17, 2014, Arro-Mark filed a Combined Declaration of Use and Incontestability under Sections 8 and 15. (*Id.* ¶ 126.) On January 8, 2019, Arro-Mark filed a Combined Declaration of Use and/or Excusable Nonuse/Application for Renewal of Registration of a Mark under Sections 8 and 9. (*Id.* ¶ 127.)

The description of the mark is: "The mark consists of three marker pen tips. There are two downward arrows surrounding the middle marker pen tip and two upward arrows surrounding the right marker pen tip. The words 'valve controlled' are above the three marker pen tips. The entire mark is contained within a rectangular box." (*Id.* ¶ 128.) Arro-Mark alleges that SKM, without Arro-Mark's authorization, used the identical "Valve Controlled" mark on its website and in promotional materials, which have been distributed at trade shows such as Fabtech held in Atlanta, Georgia on November 8-10, 2022, which had over 30,000 attendees. (*Id.* ¶ 129.)

| Arro-Mark's "Valve Controlled" Mark | SKM's Alleged Use |
| :---: | :---: |
|  | |
| (SAVC, Ex. I.) | (SAVC, Ex. I.) |

Because the "Valve Controlled" mark is registered on the Principal Register and is incontestable, Arro-Mark has established the first two elements of the claims at issue: (1) its ownership of (2) a valid and legally protectable mark.[8] Now, the Court must address the third element: likelihood of confusion.

---

[8] Generally, when a mark is federally registered on the Principal Register, and it has become incontestable, then the ownership, validity, and protectability of the mark are established. *Com. Nat'l Ins. Servs., Inc. v. Com. Ins. Agency, Inc.*, 214 F.3d 432, 438 (3d Cir. 2000).

"[M]arks are 'confusingly similar if ordinary consumers would likely conclude that the two products share a common source, affiliation, connection, or sponsorship.'" *Democratic Party of N.J., Inc. v. Devine*, No. 22-01268, 2022 U.S. Dist. LEXIS 181405, at \*17-18 (D.N.J. Oct. 4, 2022) (quoting *A&H*, 237 F.3d at 216). The Third Circuit adopted a non-exhaustive list of factors to consider in evaluating likelihood of confusion, commonly referred to as the "*Lapp* factors." *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 709 (3d Cir. 2004) (citing *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir. 1983)). These factors were developed for cases involving non-competing goods. *Lapp*, 721 F.2d at 462. Here, the goods at issue compete in the same market. Although the Third Circuit has held that courts "'need rarely look beyond the mark itself'" in cases involving competing goods, the Third Circuit has also recognized that "consideration of the *Lapp* factors . . . can be quite useful for determining likelihood of confusion even when the goods compete directly." *Kos*, 369 F.3d at 709 (quoting *A&H*, 237 F.3d at 212 (quoting *Lapp*, 721 F.2d at 462)). Accordingly, as relevant to the current action, the Court will consult the elements of the ten-part, non-exhaustive *Lapp* factors test, enumerated below:

    (1) the degree of similarity between the owner's mark and the alleged infringing mark;

    (2) the strength of the owner's mark;

    (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

    (4) the length of time the defendant has used the mark without evidence of actual confusion arising;

    (5) the intent of the defendant in adopting the mark;

    (6) the evidence of actual confusion;

    (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media;

(8) the extent to which the targets of the parties' sales efforts are the same;

(9) the relationship of the goods in the minds of consumers because of the similarity of function;

(10)      other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market.

*A&H Sportswear*, 237 F.3d at 211-12 (quoting *Lapp*, 721 F.2d at 463). Factors 7, 9, and 10 are not apposite for directly competing goods, which is the case here. *A&H*, 237 F.3d at 212 ("By definition, the goods are competing, their function is the same, and the senior and junior user are already in each other's markets."). Furthermore, "[w]here the goods or services are in direct competition . . . the degree of similarity required to prove likelihood of confusion is less than is required for dissimilar products." *E.A. Sween Co., Inc. v. Deli Exp. of Tenafly, LLC*, 19 F. Supp. 3d 560, 569 (D.N.J. 2014).

Here, for purposes of the motion to dismiss, Arro-Mark establishes a likelihood of confusion. Both marks, which are used on goods in direct competition within the same market, feature three marker pen tips, two downward arrows surrounding the middle marker pen tip, and two upward arrows surrounding the right marker pen tip. Both marks are contained within a rectangular box. Both marks are used on marking devices with similar functions. Accordingly, Arro-Mark has sufficiently stated infringement, false association, and unfair competition claims in connection with its "Valve Controlled" mark.

### b.  "Mighty Marker"

Arro-Mark is also the owner of United States Trademark Reg. No. 3,032,336 for the mark "Mighty Marker," registered in International Class 16. (SAVC ¶ 130.) The mark was registered on the Principal Register on December 20, 2005. (*Id.* ¶ 131.) On December 19, 2011, Arro-Mark filed

a Combined Declaration of Use and Incontestability under Sections 8 and 15, making its trademark incontestable. (*Id.* ¶ 132.) On November 24, 2015, Arro-Mark filed a Combined Declaration of Use and/or Excusable non-use/ Application for Renewal of Registration of a Mark under Sections 8 and 9. (*Id.* ¶ 133.) This word mark is used on all Arro-Mark markers. (*Id.* ¶ 134.) SKM sells a marker called High Purity Pump Action with the word mark "Mighty Marker" on the label. (*Id.* ¶ 135.) SKM also sells the "Low Chloride" marker, with Arro-Mark's word mark "Mighty Marker." (*Id.* ¶ 136.)

Because the "Mighty Marker" mark is registered on the Principal Register and is incontestable, Arro-Mark has established the first two elements: (1) its ownership of (2) a valid and legally protectable mark. Now, the Court must address the third element: likelihood of confusion. As explained above, "[w]here the goods or services are in direct competition . . . the degree of similarity required to prove likelihood of confusion is less than is required for dissimilar products." *E.A. Sween Co., Inc.*, 19 F. Supp. 3d at 569. Here, Arro-Mark alleges that SKM uses its "Mighty Marker" word mark on the labels of two markers it sells. (SAVC ¶¶ 135-36.) Arro-Mark uses the exact "Mighty Marker" word mark on all its Arro-Mark markers. (*Id.* ¶ 134.) These markers are sold in the same market and are in competition with each other. Accordingly, Arro-Mark has sufficiently established likelihood of confusion for its "Mighty Marker" mark.

While SKM appears to raise the affirmative defense of acquiescence in its motion to dismiss, "the proper application of the doctrine of . . . acquiescence to Plaintiff's claims requires that the Court wait until a more developed factual record is presented." *EMSL Analytical, Inc. v. Envtl. Monitoring Sys.*, No. 07-04018, 2008 U.S. Dist. LEXIS 141375, at *5 (E.D. Pa. Feb. 29, 2008) (citing *Victaulic Co. v. Tieman*, 499 F.3d 227, 236 (3d Cir. 2007) (noting that because of "factual gaps" it was premature to determine the applicability of an affirmative defense raised in a

26

motion to dismiss)). So too for SKM's implied license argument. Accordingly, Arro-Mark has sufficiently stated infringement, false association, and unfair competition claims in connection with its "Mighty Marker" mark.

### c. "Bleed-Thru"

Arro-Mark is also the owner of United States Trademark Reg. No. 3,342,246 for the mark "Bleed-Thru," registered in International Class 16. (SAVC ¶ 138.) The mark was registered on the Supplemental Register on November 20, 2007. Arro-Mark sells a marker titled "Mighty Marker Bleed Thru Ink Markers." (*Id.* ¶ 140.) SKM also sells a marker titled "Bleed Thru Ink Marker." (*Id.* ¶ 141.) SKM argues that Arro-Mark cannot sustain a claim for trademark infringement for its "Bleed-Thru" mark because the mark is merely descriptive.

Unlike Arro-Mark's "Valve Controlled" and "Mighty Marker" marks, which are registered on the Principal Register, the "Bleed-Thru" mark is registered on the Supplemental Register. If a mark is not registered on the Principal Register, a plaintiff must prove that the mark "is inherently distinctive or that it has developed secondary meaning" to establish validity and protectability. *Colur World, LLC v. SmartHealth, Inc.*, No. 09-00505, 2010 U.S. Dist. LEXIS 5844, at *10 (E.D. Pa. Jan. 25, 2010). "A mark has secondary meaning where a plaintiff demonstrates consumer recognition of the mark as the source of a service or product." *Shirley May Int'l US Inc. v. Marina Gp. LLC*, No. 21-19951, 2022 U.S. Dist. LEXIS 224261, at *16 (D.N.J. Dec. 13, 2022).

"[C]ourts in this Circuit have held that whether a term is properly categorized as generic or descriptive and whether that term has acquired secondary meaning are questions of fact." *Internet Prods. LLC v. LLJ Enters.*, No. 18-15421, 2020 U.S. Dist. LEXIS 220090, at *17 (D.N.J. Nov. 24, 2020) (citing *E.T. Browne Drug Co. v. Cococare Prods., Inc.*, 538 F.3d 185, 192 (3d

Cir.2008)). Accordingly, because the issue of descriptiveness[9] is a fact question, the Court refrains from determining this issue on a motion to dismiss. *Internet Prods. LLC*, 2020 U.S. Dist. LEXIS 220090, at \*17-18. "Therefore, the only issue is whether Plaintiff has pleaded sufficient facts to establish that, if found descriptive, the [mark has] acquired secondary meaning." *Id.* at \*18.

Arro-Mark's SAVC asserts that the "Bleed-Thru" mark has acquired secondary meaning. (SAVC ¶¶ 263, 322.) To support this assertion, Arro-Mark states that it has used the "Bleed Thru" mark for at least 17 years. (*Id.* ¶ 261.) "Arro-Mark has invested significant sums of money and time to develop and protect its Bleed-Thru trademark." (*Id.* ¶ 264.) The mark is "well-known within the ink and paint manufacturing market as belonging to Arro-Mark" (*id.* ¶ 265), and the mark "enjoys a well-built reputation and substantial goodwill in the ink and paint manufacturing market." (*Id.* ¶ 267.) For purposes of a motion to dismiss, this is sufficient. *See, e.g.*, *Oppenheimer v. Trs. of the Stevens Instiute of Tech.*, 679 F. Supp. 3d 48, 51 (D.N.J. 2023); *Internet Prods. LLC*, 2020 U.S. Dist. LEXIS 220090, at \*18; *Hampden Eng'g Corp. v. Shear Tech., LLC*, No. 15-7424, 2017 U.S. Dist. LEXIS 69939, at \*6 (D.N.J. May 5, 2017). Accordingly, Arro-Mark has sufficiently stated infringement, false association, and unfair competition claims in connection with its "Bleed Thru" mark.

The motion to dismiss is denied as to Counts 10, 12, 13, and 17.

### d. Muscle Man

Arro-Mark's common law trademark infringement claim (Count 11) is based on its purported common law "Muscle Man" trademark. (SAVC ¶¶ 297-310.) "Arro-Mark has used the image of a 'Muscle Man' on its 'Mighty Marker DG' for at least 21 years to identify and

---

[9] A mark is "merely descriptive" if the mark describes the qualities or characteristics of a good or service. *ChemLogix LLC v. Bulk Tainer Logistics N. Am., Inc.*, No. 22-1006, 2023 U.S. Dist. LEXIS 157150, at \*13 (E.D. Pa. Sep. 5, 2023) (citing *I.M. Wilson, Inc. v. Otvetstvennostyou "Grichko"*, 614 F. Supp. 3d 114, 138 (E.D. Pa. 2022)).

distinguish its goods and services, namely its line of 'Mighty Marker DG' markers for interstate commerce and in connection with the promotion and advertising of its 'Mighty Marker DG' line of markers." (SAVC ¶ 298.) Arro-Mark's "Muscle Man" mark is a design mark, an image of which can be seen below on the label of an Arro-Mark marker.



SKM argues Arro-Mark fails to state a common law trademark infringement claim because Arro-Mark does not own a valid and legally protectable "Muscle Man" trademark. (Def. Br. at 24.)

To state a claim for common law trademark infringement under New Jersey law, a plaintiff must allege the same elements as for claims arising under the Lanham Act, including ownership, validity, and likelihood of confusion. *See Profoot, Inc. v. MSD Consumer Care, Inc.*, No. 11-7079, 2012 U.S. Dist. LEXIS 51888, at *16 (D.N.J. Apr. 11, 2012) (citing *SK&F, Co. v. Premo Pharm. Labs., Inc.*, 625 F.2d 1055, 1066 (3d Cir. 1980)). With respect to ownership of unregistered marks, such as the "Muscle Man" mark at issue here, the first party to adopt a trademark can assert ownership rights, provided it continuously uses the mark in commerce. *Ford Motor Co. v. Summit Motor Prods.*, 930 F.2d 277, 292 (3d Cir. 1991). SKM challenges whether Arro-Mark was the first to use the "Muscle Man" mark. While Arro-Mark's SAVC states that it has used the "Muscle Man" mark for about 21 years in connection with the advertising and sale of "Mighty Marker DG" markers (SAVC ¶ 298), the SAVC does not establish whether Arro-Mark was the first to use the

"Muscle Man" mark. Accordingly, Plaintiff's common law trademark infringement claim (Count 11) is dismissed without prejudice.[10]

### G.  Trademark Dilution (Counts 15 and 16)

Arro-Mark asserts two claims of trademark dilution against Defendant SKM: federal trademark dilution under 15 U.S.C. § 1125(c)(l) of the Lanham Act (Count 15) and trademark dilution under N.J. Stat. Ann. § 56:3-13.20 (Count 16). SKM argues Arro-Mark's claims must be dismissed because the marks are not famous, and they are inherently descriptive. (Def. Br. at 30-32; Reply at 10-12.)

The federal cause of action for trademark dilution grants extra protection to strong, well-recognized marks even in the absence of a likelihood of consumer confusion—the classical test for trademark infringement—if the defendant's use diminishes or dilutes the strong identification value associated with the plaintiff's famous mark." *Times Mirror Magazines, Inc. v. Las Vegas Sports News, L.L.C.*, 212 F.3d 157, 163 (3d Cir. 2000); *see also* 15 U.S.C. § 1125(c)(1).  A trademark dilution claim has the following elements: (1) "plaintiff is the owner of a mark that qualifies as a 'famous' mark," (2) defendant is making commercial use of the mark in interstate commerce, (3) defendant began using the mark after the plaintiff's mark became famous, and (4) "[d]efendant's use causes dilution by lessening the capacity of the plaintiff's mark to identify and distinguish goods or services." *Id.*  Because the New Jersey anti-dilution statute appears to be the state-law equivalent of the federal anti-dilution statute, courts have applied the same analysis to both types of claims. *Lorillard Tobacco Co. v. Tiger Mart, Inc.*, No. 03-1327, 2005 U.S. Dist. LEXIS 54184, at *21 (D.N.J. Jan. 20, 2005) (citing *Jews For Jesus v. Brodsky*, 993 F. Supp. 282, 311 (D.N.J. 1998)); *see CIT Group, Inc. v. Citicorp*, 20 F. Supp. 2d 775, 794 (D.N.J. 1998)

---

[10] Because the Court is dismissing this claim for failure to establish ownership, the Court declines to address the other grounds for dismissal raised by SKM.

("Because the standard for dilution under the Lanham Act and N.J.S.A. 56:3-13.20 are similar, . . . it fails to state a claim under the New Jersey dilution statute . . . .").

A famous mark is one that is "widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A). This is a "rigorous standard, as it extends protection only to highly distinctive marks that are well-known throughout the country." *Green v. Fornario*, 486 F.3d 100, 105 (3d Cir. 2007). To determine whether a mark is famous, Section 1125(c)(2)(A) provides that a court may consider all relevant factors, including the following:

> (i) The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.
> (ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark.
> (iii) The extent of actual recognition of the mark.

15 U.S.C. § 1125(c)(2)(A).

A mark's fame can be addressed on a motion to dismiss. *See, e.g.*, *Rockwell Automation, Inc. v. Radwell Int'l, Inc.*, No. 15-5246, 2016 WL 7018531, at *6 (D.N.J. Nov. 30, 2016) ("Because Plaintiff fails to plead facts supporting wide recognition of its marks by the general consuming public, it fails to state a claim for trademark dilution."); *Xtreme Caged Combat v. ECC Fitness*, No. 12-3855, 2012 WL 5893970, at *6 (E.D. Pa. Nov. 21, 2012) (dismissing trademark dilution claim because the plaintiff failed to plead sufficient facts for the court to conclude that the mark was famous). Arro-Mark asserts that "Arro-Mark's Valve Controlled design mark, 'Mighty Marker' mark, 'Bleed Thru' mark, and 'Mighty Marker Muscle Man' mark are famous, widely recognized, and distinctive *among consumers in the marking pen manufacturing market*." (SAVC ¶¶ 365, 390 (emphasis added).) However, "recognition within a specific niche market is insufficient to establish fame. . . . [T]he mark must be 'widely recognized by the general consuming

31

public of the United States' to be famous." *Muhammad v. Nike, Inc.*, No. 20-17892, 2021 U.S. Dist. LEXIS 171981, at *6-7 (D.N.J. Sep. 10, 2021) (quoting *Green v. Fornario*, 486 F.3d 100, 105 (3d Cir. 2007) (quoting 15 U.S.C. § 1125(c)(2)(A))).[11] Because Arro-Mark does not allege that its marks are widely recognized by the general consuming public, but instead are recognized within the specific marking pen manufacturing market, Arro-Mark fails to state a claim for dilution. Accordingly, Counts 15 and 16 are dismissed without prejudice.

### H.  Trade Dress Infringement (Count 18)

Arro-Mark asserts one claim of trade dress infringement against Defendant SKM pursuant to the Lanham Act, 15 U.S.C. § 1125 (Count 18). Arro-Mark's trade dress infringement claim is based on its website and SKM's creation of a similar website. (SAVC ¶¶ 421-27.) Arro-Mark describes its trade dress, and the trade dress that SKM allegedly infringed upon, as follows:

  a.  The look and feel of Plaintiff's website [including] layouts, and design elements, including the placement of specific phrases, words, photographs, colors, boarders, backgrounds, interactive elements, movement of markers, and overall mood, style and impression;

  b.  The digital photographs and artwork, promotional materials, and informational materials created by Plaintiff;

  c.  Plaintiff's Valve-Controlled design marker, Mighty Marker, Bleed-Thru, Mighty Marker Muscle Man and Muscle man trademarks;

  d.  The "Dancing" marker effect;

  e.  The tool bar inside of a marker; and

  f.  The unique description of Plaintiff's products and processes.

---

[11] *See also Harp v. Rahme*, 984 F. Supp. 2d 398, 421 (E.D. Pa. 2013) (noting that due to amendment to the federal dilution statute, courts "reject dilution claims based on niche fame, i.e. fame limited to a particular channel of trade, segment of industry or service, or geographic region." (quoting *Dan-Foam A/S v. Brand Named Beds, LLC*, 500 F. Supp. 2d 296, 306 n.87 (S.D.N.Y. 2007))).

(SAVC ¶ 426.) SKM asserts that Arro-Mark's trade dress claim must be dismissed because all the alleged trade dress is merely functional. (Def. Br. at 32-34.)

Section 43 of the Lanham Act creates a federal cause of action for trade dress infringement. 15 U.S.C. § 1125(a); *see also Buzz Bee Toys, Inc. v. Swimways Corp.*, 20 F. Supp. 3d 483, 496 (D.N.J. 2014). "Trade dress has been defined as the total image or overall appearance of a product, and includes, but is not limited to, such features as size, shape, color or color combinations, texture, graphics, or even a particular sales technique." *Rose Art Indus., Inc. v. Swanson*, 235 F.3d 165, 171 (3d Cir. 2000) (citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 765 n. 1, (1992)). In other words, "trade dress is the overall look of a product or business." *Fair Wind*, 764 F.3d at 308. "The purpose of trade dress protection is to 'secure the owner of the trade dress the goodwill of his business and to protect the ability of consumers to distinguish among competing producers.'" *McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*, 511 F.3d 350, 357 (3d Cir. 2007) (quoting *Shire U.S. Inc. v. Barr Labs., Inc.*, 329 F.3d 348, 353 (3d Cir. 2003)).

To state a claim for trade dress infringement, a complaint must set forth facts sufficient to support the inference that "(1) the allegedly infringing design is non-functional; (2) the design is inherently distinctive or has acquired secondary meaning; and (3) consumers are likely to confuse the source of the plaintiff's product with that of the defendant's product." *McNeil*, 511 F.3d at 357 (citing *Shire US Inc.*, 329 F.3d at 353).

Additionally, the plaintiff must "articulat[e] the specific elements which comprise its distinct dress." *Fair Wind*, 764 F.3d at 309 (quoting *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 381 (2d Cir. 1997)). Indeed, the Third Circuit has noted that "before [] reach[ing] the question of protectability . . . a district court should scrutinize a plaintiff's description of its trade dress to ensure itself that the plaintiff seeks protection of visual elements

of its business." *Fair Wind*, 764 F.3d at 309. Here, Arro-Mark does not identify "[t]he digital photographs and artwork, promotional materials, and informational materials created by Plaintiff" that constitute protectable trade dress. Similarly, Arro-Mark's statement that "layouts, and design elements, including the placement of specific phrases, words, photographs, colors, boarders, backgrounds, interactive elements, movement of markers, and overall mood, style and impression" constitute trade dress does not identify specific elements that comprise distinct trade dress.[12] Accordingly, the Court cannot assess whether these items form the basis of a viable trade dress claim. The Court addresses the remaining items from the SAVC below.

### a.  Functionality

Trade dress protection "may not be claimed for product features that are functional." *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 29 (2001).[13] The Supreme Court has defined functional trade dress as that which (1) "is essential to the use or purpose of the article[;]" (2) "affects the cost or quality of the article[;]" or (3) would, if denied to others, "put competitors at a significant non-reputation-related disadvantage." *TrafFix*, 532 U.S. at 33 (internal citations omitted). "Features that identify for website visitors the products sold on that website are functional." *Bambi Baby.com Corp. v. Madonna Ventures, Inc.*, No. 18-12669-WHW-CLW, 2019 U.S. Dist. LEXIS 92263, at *10 (D.N.J. June 3, 2019). Accordingly, "[t]he unique description of Plaintiff's products and processes[,]" "Plaintiff's Valve-Controlled design marker, Mighty Marker, Bleed-Thru, Mighty Marker Muscle Man and Muscle man trademarks[,]" and Plaintiff's informational and promotional materials identifying the products are all functional and therefore

---

[12] *Cf. Bambi Baby.com Corp. v. Madonna Ventures, Inc.*, No. 18-12669, 2019 U.S. Dist. LEXIS 92263, at *13-14 (D.N.J. June 3, 2019)  (finding a plaintiff's description of its website's trade dress as a "distinctive palette of colors and image/video filters featuring a clean, modern, and straightforward user interface highlighted by bright, vibrant colors set in an environment/backdrop of warm, baby tones" sufficient to describe a website's trade dress for purposes of a stating a claim on a motion to dismiss).

[13] Much trade dress is functional, as the Supreme Court explained: "product design almost invariably serves purposes other than source identification[.]" *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 213 (2000).

not protectable trade dress. However, Arro-Mark also alleges that "[t]he 'Dancing' marker effect" and "[t]he tool bar inside of a marker" constitute trade dress. Those elements are not essential to the use or purpose of Arro-Mark's website or products, do not affect quality, and if denied to competitors, would not put them at a significant non-reputation-related disadvantage. *TrafFix*, 532 U.S. at 33. Accordingly, these two elements of the website are non-functional.

### b.   Inherent Distinctiveness or Secondary Meaning

Trade dress is only protectible if it is distinctive. *Bambi Baby.com Corp.*, 2019 U.S. Dist. LEXIS 92263, at *14 (citing *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 207 (2000) ("decid[ing] under what circumstances a product's [trade dress] is distinctive, and therefore protectible")). Distinctiveness arises in one of two ways: "First, [trade dress] is inherently distinctive if [its] intrinsic nature serves to identify a particular source[.] Second, [trade dress] has acquired distinctiveness, even if it is not inherently distinctive, if it has developed secondary meaning[.]" *Bambi Baby.com Corp.*, 2019 U.S. Dist. LEXIS 92263, at *14-15 (citing *Wal-Mart Stores, Inc.*, 529 U.S. at 210-11 (citations omitted)). Secondary meaning "occurs when, in the minds of the public, the primary significance of a [trade dress] is to identify the source of the product rather than the product itself." *Bambi Baby.com Corp.*, 2019 U.S. Dist. LEXIS 92263, at *15 (quoting *Wal-Mart Stores, Inc.*, 529 U.S. at 211); *see also Ideal Toy* Corp. *v. Plawner Toy Mfg.* Corp., 685 F.2d 78, 82 (3d Cir. 1982) ("When the primary significance of the trade dress to a consumer is in designating not the product but its producer, the trade dress has acquired secondary meaning"). Arro-Mark's SAVC fails to provide allegations that establish its trade dress is inherently distinctive or has acquired secondary meaning. While Arro-Mark states that its website is "unique and distinct in the marketplace" (SAVC ¶ 422), this statement alone is not enough to establish inherent distinctiveness or secondary meaning. *Cf. Bambi Baby.com Corp.*,

2019 U.S. Dist. LEXIS 92263, at *16 (finding an amended complaint, which included "naked" assertions that trade dress was distinctive, still stated a trade dress infringement claim because plaintiff included sufficient allegations that its website trade dress had become recognized by consumers as a symbol of the plaintiff, and the website "incorporates a distinctive visual design, graphic treatment, and familiar interface that has become readily identifiable by the consuming public as originating from [the plaintiff]."). Accordingly, Arro-Mark's trade dress infringement claim (Count 18) is dismissed without prejudice.

### I.   Trademark Counterfeiting (Counts 19 and 20)

Arro-Mark also alleges SKM engaged in federal and state trademark counterfeiting. SKM argues that Arro-Mark fails to state a claim because SKM did not infringe on Arro-Mark's marks. (Def. Br. 35-36.)

"To establish trademark counterfeiting . . . the record must show (1) the defendant infringed a registered trademark in violation of the Lanham Act, 15 U.S.C. § 1114(1)(a) and (2) the defendant intentionally used the trademark knowing it was counterfeit or was willfully blind to such use." *Coach, Inc. v. Ocean Point Gifts*, No. 09-4215, 2010 WL 2521444, at *3 (D.N.J. June 14, 2010). "The only distinction between the standard for federal trademark counterfeiting and the standard for establishing infringement is that to obtain treble or statutory damages for a counterfeiting claim, a plaintiff must show that the defendant intentionally used the plaintiff's trademark, knowing that it was a counterfeit." *Id.* (quoting *Chanel, Inc. v. Gordashevsky*, 558 F. Supp. 2d 532, 536-37 (D.N.J. 2008)). As discussed, Plaintiff has stated a cause of action for federal trademark infringement for its "Valve Controlled," "Mighty Marker," and "Bleed Thru," marks; therefore, the Court considers whether Arro-Mark sufficiently alleged that SKM's use of the counterfeit marks was knowing.

36

Arro-Mark asserts that "SKM is creating identical goods, such as Alcohol based markers, Cow-Tag markers, and Bleed-Thru markers, and utilizing counterfeit and unauthentic marks, including but not limited to Mighty Marker, Bleed-Thru and Valve Controlled design marks." (SAVC ¶ 433.) Arro-Mark alleges that SKM created these goods by utilizing Arro-Mark trade secrets and trademarks, which were wrongfully disseminated by Mamary and Warren to SKM. Arro-Mark alleges that these trade secrets were only known to select Arro-Mark employees, and SKM actively sought out such trade secrets and other information to "steal" from Arro-Mark (SAVC ¶ 101) and create its own versions of Arro-Mark products. (*See, e.g.*, *id.* ¶ 119.) For purposes of the motion to dismiss, these allegations are sufficient to establish knowledge, and Arro-Mark's federal trademark counterfeiting claim is not dismissed.

Similarly, pursuant to the New Jersey statute, a plaintiff may state a claim for trademark counterfeiting if it establishes:

> (1) The use, without consent of the owner or designee, of any reproduction, counterfeit, copy, or colorable imitation of a mark in connection with the sale, distribution, offering for sale, or advertising in this State of any goods or services on or in connection with which the use is likely to cause confusion or mistake or to deceive as to the source of origin of the goods or services;

N.J. Stat. Ann. § 56:3-13.16. Arro-Mark explicitly asserts that SKM's use was unauthorized. (*See, e.g.*, SAVC ¶ 449.) Accordingly, Arro-Mark's New Jersey state law counterfeiting claim survives.

## IV.    CONCLUSION

For the reasons set forth above, SKM Defendants' motion to dismiss is **GRANTED in part** and **DENIED in part.** Plaintiff has 30 days to file an amended complaint. An appropriate order accompanies this opinion.

*/s/ Jamel K. Semper*
**HON. JAMEL K. SEMPER**
**United States District Judge**

Orig:        Clerk
cc:          Michael A. Hammer, U.S.M.J.